Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMBER EVANS, derivatively on behalf of FUNKO, INC. | |
| Plaintiff, | Case No.: |
| v. | |
| BRIAN MARIOTTI, JENNIFER FALL JUNG, RUSSELL NICKEL, KEN BROTMAN, GINO DELLOMO, CHARLES DENSON, DIANE IRVINE, ADAM KRIGER, MICHAEL LUNSFORD, and SARAH KIRSHBAUM LEVY, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| FUNKO, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**INTRODUCTION**

Plaintiff Amber Evans ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Funko, Inc. ("Funko" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Brian Mariotti, Jennifer Fall Jung, Russell Nickel, Ken Brotman, Gino Dellomo, Charles Denson, Diane Irvine, Adam Kriger, Michael Lunsford, and Sarah Kirshbaum Levy (collectively, the "Individual Defendants," and together with Funko, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Funko, unjust enrichment, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, she alleges the following based upon personal knowledge as to her and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Funko, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Funko's directors and officers from August 8, 2019 through the present (the "Relevant Period").

2.      Funko designs and sells action figures, plush products, apparel, accessories, and other consumer products that are based on and draw inspiration from various pop

1

culture franchises. Among the Company's most well-known offerings is its Funko Pop! brand, a line of stylized vinyl figurines made in the image of characters from Star Wars, Marvel Comics, Dragon Ball Z, and other popular franchises.

3.    Throughout the Relevant Period, the Individual Defendants touted the Company's purportedly strong sales and growth prospects. Moreover, in each of the Company's periodic reports filed with the SEC during the Relevant Period, the Individual Defendants attested to the importance of maintaining sufficient inventory levels. Among other things, the Individual Defendants represented that *if* the Company's sales failed to meet expectations, such failures *could* result in excess inventory, which would need to be written down or discarded.

4.    Unbeknownst to the investing public, however, not only was Funko actually facing a decline in sales, but the Company's lower than expected sales figures would predictably cause the Company to record millions of dollars in inventory write-down to dispose of excess inventory.

5.    On February 5, 2020, after the market had closed, the Individual Defendants released the Company's preliminary financial results for the fourth quarter of 2019, surprising the market with declining sales and inventory write-downs. Specifically, the Individual Defendants reported an 8% decrease in net sales as compared to the fourth quarter of 2018, as well as a $16.8 million inventory write-down to "dispose of slower moving inventory."

6.    On this news, the price of the Company's stock plummeted by approximately 40%, falling from $15.49 per share at the close of trading on February 5, 2020, to $9.29 per share at the close of trading on February 6, 2020.

7.    A month later, on March 5, 2020, the Individual Defendants released the Company's fourth quarter and full year 2019 financial results, which confirmed the disappointing results previously disclosed on February 5, 2020, including a 4% year-

over-year decrease in net sales. The Individual Defendants purported that such results were due to "softness at retail during the holiday season," among other things.

8.     On this news, the price of the Company's stock dropped once more, from $7.24 per share at the close of trading on March 5, 2020, to $6.92 per share at the close of trading on March 6, 2020, a decline of approximately 4%.

9.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Funko's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) The Company was suffering from declining sales; (2) as a result, the Company likely would, and ultimately did, incur a significant write-down related to slower-moving inventory; and (3) due to the foregoing, Funko's public statements were materially false and misleading at all relevant times.

10.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12.     Furthermore, during the Relevant Period, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales, netting collective proceeds of over $104 million.

13.     In light of the Individual Defendants' misconduct, which has subjected Funko, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its former CFO to being named as defendants in three federal securities fraud class action lawsuits, two pending in the United States District Court for the Central District of

California, and one pending in the United States District Court for the Western District of Washington (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Funko's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

16.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

17.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

Verified Shareholder Derivative Complaint

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

21.     Venue is proper in this District because Funko and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Funko common stock. Plaintiff has continuously held Funko common stock since before the beginning of the Relevant Period.

### Nominal Defendant Funko

23.     Funko is a Delaware corporation with its principal executive offices located at 2802 Wetmore Avenue, Everett Washington 98201. Funko's shares trade on NASDAQ under the ticker symbol "FNKO." Funko's common stock is divided into publicly-traded Class A common stock, and non-public Class B common stock, both of which entitle holders to one vote per share.

### Defendant Mariotti

24.     Defendant Brian Mariotti ("Mariotti") has served as the Company's CEO since April 2017. He has also served as the CEO of Funko Acquisition Holdings, L.L.C. ("FAH"), the predecessor of Funko, since October 2015, and as the CEO of Funko Holdings LLC ("FHL") since May 2013. FAH is a holding company with no assets, and

Verified Shareholder Derivative Complaint

owns 100% of FHL, also a holding company, which in turn owns 100% of Funko, LLC, the Company's operating entity. According to the Company's Schedule 14A filed with the SEC on April 15, 2020 (the "2020 Proxy Statement"), as of April 3, 2020, Defendant Mariotti beneficially owned 3,464,295 shares of the Company's Class A common stock, as well as 2,531,690 shares of the Company's Class B common stock, which afforded him approximately 5.1% of total voting power over matters set for shareholder determination as of that date. Given that the price per share of the Company's Class A common stock at the close of trading on April 3, 2020 was $3.18, Defendant Mariotti owned over $11 million worth of Funko stock.

25.    For the fiscal year ended December 31, 2019, Defendant Mariotti received $4,025,457 in compensation from the Company. This included $1,000,000 in salary, $357,938 in stock awards, $1,341,827 in option awards, $1,313,250 in non-equity incentive plan compensation, and $12,442 in all other compensation.

26.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Mariotti made the following sales of company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 8/12/2019 | 50,000 | $23.55 | $1,177,500 |
| 9/19/2019 | 400,000 | $25.42 | $10,168,000 |
| 9/20/2019 | 50,000 | $22.65 | $1,132,500 |
| 10/21/2019 | 50,000 | $18.14 | $907,000 |

27.    Thus, in total, before the fraud was exposed, he sold 550,000 Company shares on inside information, for which he received approximately $13,385,000. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28.    The Company's 2020 Proxy Statement stated the following about Defendant Mariotti:

6

Brian Mariotti has served as Funko, Inc.'s Chief Executive Officer and as a member of Funko, Inc.'s Board of Directors since its formation in April 2017, as the Chief Executive Officer of FAH, LLC and as a member of FAH, LLC's board of directors since October 2015, and as Chief Executive Officer of FHL and as a member of FHL's board of directors since May 2013. Mr. Mariotti has also served as Chief Executive Officer of Funko, LLC since he acquired the business with a small group of investors in 2005. We believe Mr. Mariotti's knowledge of the pop culture industry and many years of experience as our Chief Executive Officer make him well-qualified to serve as a member of our Board of Directors.

**Defendant Fall Jung**

29.     Defendant Jennifer Fall Jung ("Fall Jung") has served as the Company's CFO since August 2019.

30.     For the fiscal year ended December 31, 2019, Defendant Fall Jung received $1,248,155 in compensation from the Company. This included $153,654 in salary, $212,486 in stock awards, $790,622 in option awards, $67,262 in non-equity incentive plan compensation, and $24,131 in all other compensation.

31.     The Company's annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K") stated the following about Defendant Fall Jung:

Jennifer Fall Jung has served as Funko, Inc.'s Chief Financial Officer since August 2019. Ms. Fall Jung previously served as Senior Vice President, Corporate Finance and Investor Relations of Gap, Inc. ("Gap"), a global clothing and accessories retailer, from January 2017 to March 2018. Prior to January 2017, Ms. Fall Jung served in various other roles at Gap, including Senior Vice President and Chief Financial Officer of Old Navy Global and Head of International from November 2012 to January 2017, Chief Financial Officer and Senior Vice President of Gap North America from February 2011 to November 2012, and Chief Financial Officer and Vice President of Strategy and Real Estate for Gap, Inc. Outlet from April 2007 to February 2011. Ms. Fall Jung received her B.B.A. in Finance and her M.B.A., with an emphasis in International Business from San Diego State University.

**Defendant Nickel**

32.     Defendant Russell Nickel ("Nickel") served as the Company's CFO from October 2013 until he resigned in August 2019. He continued to serve as a Special

Advisor to the Company through December 31, 2019.

33. The Company's annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K") stated the following about Defendant Nickel:

> Russell Nickel has served as Funko, Inc.'s Chief Financial Officer since its formation in April 2017, and as the Chief Financial Officer and Secretary of FAH, LLC since October 2013. Mr. Nickel was Vice President of Finance at ClipCard from May 2013 until October 2013, and the Institute for Corporate Productivity (i4cp) from 2011 until 2013, where he was responsible for all finance, accounting, and legal matters. Before joining i4cp, Mr. Nickel held various senior finance and accounting positions in other companies and also worked in public accounting, including as an Audit Manager at KPMG, LLP. Mr. Nickel received a B.A. in Accounting from the University of Washington.

**Defendant Brotman**

34. Defendant Ken Brotman ("Brotman") is the Chairman of the Company's Board, and has served as a Company director since April 2017. Defendant Brotman cofounded, and serves as a managing partner at ACON Funko Investors L.L.C. ("ACON") a private equity investment firm and a significant shareholder of Funko. He has also served as a director of FAH since October 2015. Additionally, he serves as the Chair of the Company's Nominating and Corporate Governance Committee, and as a member of the Compensation Committee.

35. For the fiscal year ended December 31, 2019, Defendant Brotman received $163,525 in compensation from the Company. This included $90,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

36. During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Brotman made the following sale of company stock through his position at ACON:

| Date | Number of Shares | Price Per Share | Proceeds |
| --- | --- | --- | --- |
| 9/19/2019 | 3,600,000 | $25.42 | $91,512,000 |

37.     ACON's insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates Defendant Brotman's motive in facilitating and participating in the scheme.

38.     The Company's 2020 Proxy Statement stated the following about Defendant Brotman:

> Ken Brotman has served on the Board of Directors of Funko, Inc. since its formation in April 2017, and on the board of directors of FAH, LLC since October 2015. Mr. Brotman is a Founder and Managing Partner at ACON Investments, which he co-founded in 1996. Before that, Mr. Brotman was a partner at Veritas Capital, Inc. from 1993 until 1996, and, between 1987 and 1993, held positions at various private equity firms including Bain Capital and Wasserstein Perella Management Partners. Mr. Brotman has served on the board of directors of various ACON Investments portfolio companies since 1997 including several in the retail and consumer products sectors. Mr. Brotman received an M.B.A. from Harvard Business School and a B.S. in Economics from The Wharton School of the University of Pennsylvania. We believe Mr. Brotman's extensive private equity investment and company strategy and oversight experience and background with respect to acquisitions, debt financings and equity financings makes him well-qualified to serve as a member and as the chairman of our Board of Directors.

**Defendant Dellomo**

39.     Defendant Gino Dellomo ("Dellomo") has served as a Company director since April 2017. Defendant Dellomo has also served on the board of directors at FAH since October 2015, and as a director at ACON since October 2006. Additionally, he serves as a member of the Company's Nominating and Corporate Governance Committee.

40.     For the fiscal year ended December 31, 2019, Defendant Dellomo received $123,525 in compensation from the Company. This included $50,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

41.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme

was exposed, Defendant Dellomo made the following sale of company stock through his position at ACON:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 9/19/2019 | 3,600,000 | $25.42 | $91,512,000 |

42.     ACON's insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates Defendant Dellomo's motive in facilitating and participating in the scheme.

43.     The Company's 2020 Proxy Statement stated the following about Defendant Dellomo:

> Gino Dellomo has served on the Board of Directors of Funko, Inc. since its formation in April 2017, and on the board of directors of FAH, LLC since October 2015. Mr. Dellomo is a Director at ACON Investments L.L.C. ("ACON Investments"), which he joined in October 2006. Since October 2006, he has also served on the board of directors of various ACON Investments portfolio companies. Between 2001 and 2006, Mr. Dellomo held various positions at various investment banks, including Deutsche Bank Securities, Inc., FBR Capital Markets & Co. and MCG Capital Corp. Mr. Dellomo received a B.S. in Finance from Georgetown University. We believe Mr. Dellomo's private equity investment and company oversight experience and background with respect to acquisitions, debt financings and equity financings makes him well-qualified to serve as a member of our Board of Directors.

**Defendant Denson**

44.     Defendant Charles Denson ("Denson") has served as a Company director since April 2017. Defendant Denson has also served on the board of directors at FAH since June 2016. Additionally, he serves as the Chair of the Company's Compensation Committee, and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of April 3, 2020, Defendant Denson beneficially owned 159,517 shares of the Company's Class A common stock, as well as 16,058 shares of the Company's Class B common stock. Given that the price per share of the Company's Class A common stock

at the close of trading on April 3, 2020 was $3.18, Defendant Denson owned approximately $507,264 worth of Funko stock.

45.     For the fiscal year ended December 31, 2019, Defendant Denson received $138,525 in compensation from the Company. This included $65,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

46.     The Company's 2020 Proxy Statement stated the following about Defendant Denson:

> Charles Denson has served on the Board of Directors of Funko, Inc. since its formation in April 2017, and on the board of directors of FAH, LLC since June 2016. Mr. Denson has served as the President and Chief Executive Officer of Anini Vista Advisors, an advisory and consulting firm, since March 2014. From February 1979 until January 2014, Mr. Denson held various positions at NIKE, Inc., where he was appointed to several management roles, including, in 2001, President of the NIKE Brand, a position he held until January 2014. Mr. Denson serves on the board of directors of several privately held organizations. Mr. Denson received a B.A. in Business from Utah State University. We believe Mr. Denson's extensive experience in brand building, brand management and organizational leadership in the public company context makes him well-qualified to serve on our Board of Directors.

**Defendant Irvine**

47.     Defendant Diane Irvine ("Irvine") has served as a Company director and as a director of FAH since August 2017. She also serves as the Chair of the Company's Audit Committee, and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of April 3, 2020, Defendant Irvine beneficially owned 63,800 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 3, 2020 was $3.18, Defendant Irvine owned approximately $202,884 worth of Funko stock.

48.     For the fiscal year ended December 31, 2019, Defendant Irvine received $142,275 in compensation from the Company. This included $68,750 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

49.     The Company's 2020 Proxy Statement stated the following about Defendant Irvine:

> Diane Irvine has served on the Board of Directors of Funko, Inc. and the board of directors of FAH, LLC since August 2017. Ms. Irvine previously served as Chief Executive Officer of Blue Nile, Inc., an online retailer of diamonds and fine jewelry, from February 2008 until November 2011, as President from February 2007 until November 2011, and as Chief Financial Officer from December 1999 until September 2007. From February 1994 until May 1999, Ms. Irvine served as Vice President and Chief Financial Officer of Plum Creek Timber Company, Inc., and from September 1981 until February 1994, she worked at accounting firm Coopers & Lybrand LLP in various capacities, most recently as partner. Ms. Irvine currently serves on the boards of directors of Casper Sleep Inc. (on whose board she has served since August 2019), Yelp Inc. (on whose board she has served since September 2011) and D.A. Davidson & Co. (on whose board she has served since January 2018), and previously served on the boards of directors of XO Group Inc. from November 2014 until December 2018, Rightside Group Ltd. from August 2014 until July 2017, CafePress, Inc. from July 2012 until May 2015, and Blue Nile, Inc. from May 2001 until November 2011. Ms. Irvine received an M.S. in Taxation and a Doctor of Humane Letters from Golden Gate University, and a B.S. in Accounting from Illinois State University. We believe Ms. Irvine's extensive leadership experience as a Chief Financial Officer and Chief Executive Officer at Blue Nile, Inc., her financial expertise, and her experience as a director of several public companies make her well-qualified to serve as a member of our Board of Directors. Ms. Irvine also contributes to the gender diversity of our Board of Directors.

**Defendant Kriger**

50.     Defendant Adam Kriger ("Kriger") has served as a Company director since April 2017. Defendant Kriger has also served on the board of directors at FAH since June 2016, and has served as an executive partner at ACON since August 2017. Additionally, he serves as a member of the Company's Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of April 3, 2020, Defendant Kriger beneficially owned 32,117 shares of the Company's Class A common stock, as well as 16,058 shares of the Company's Class B common stock. Given that the price per

share of the Company's Class A common stock at the close of trading on April 3, 2020 was $3.18, Defendant Kriger owned approximately $102,132 worth of Funko stock.

51.     For the fiscal year ended December 31, 2019, Defendant Kriger received $123,525 in compensation from the Company. This included $50,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

52.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kriger made the following sale of company stock through his position at ACON:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 9/19/2019 | 3,600,000 | $25.42 | $91,512,000 |

53.     ACON's insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates Defendant Kriger's motive in facilitating and participating in the scheme.

54.     The Company's 2020 Proxy Statement stated the following about Defendant Kriger:

> Adam Kriger has served on the Board of Directors of Funko, Inc. since its formation in April 2017, and on the board of directors of FAH, LLC since June 2016. Mr. Kriger is an Executive Partner at ACON Investments L.L.C., which he joined in August 2017. Before that, Mr. Kriger served as the Senior Vice President of Global Strategy for McDonald's Corporation from December 2001 until March 2015. He also previously served as the Senior Vice President of Global Strategy for Starwood Hotels & Resorts Worldwide from 1998 until 1999, and as the Vice President of Strategy and Development for The Walt Disney Company from 1988 until 1990, and then again from 1992 until 1998. Mr. Kriger serves on the boards of several non-profit organizations and private companies. Mr. Kriger received an M.B.A. from Harvard Business School and a B.A. in Quantitative Economics from Stanford University. We believe Mr. Kriger's extensive strategic, risk management and organizational leadership experience in the public company context make him well-qualified to serve on our Board of

Directors.

**Defendant Lunsford**

55.     Defendant Michael Lunsford ("Lunsford") has served as a Company director since October 2018. He also serves as a member of the Company's Audit Committee. According to the 2020 Proxy Statement, as of April 3, 2020, Defendant Lunsford beneficially owned 5,098 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 3, 2020 was $3.18, Defendant Lunsford owned approximately $16,211 worth of Funko stock.

56.     For the fiscal year ended December 31, 2019, Defendant Lunsford received $123,525 in compensation from the Company. This included $50,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

57.     The Company's 2020 Proxy Statement stated the following about Defendant Lunsford:

> Michael Lunsford has served on the board of directors of Funko, Inc. since October 2018. Mr. Lunsford previously served as the Chief Executive Officer of SK Planet, Inc., an internet platform development company, from September 2014 until August 2018 and as interim Chief Executive Officer of shopkick, Inc. in 2016. From January 2008 to May 2013, Mr. Lunsford held various management roles with RealNetworks, Inc., a provider of internet streaming media delivery software and services, including interim Chief Executive Officer and Executive Vice President and General Manager of RealNetworks' Core Business and Chief Executive Officer of Rhapsody. Mr. Lunsford also served on the board of directors of shopkick, Inc. from 2013 to 2018, and on the boards of directors of various portfolio companies owned by SK Planet, Inc. from 2013 to 2018. Since 2014, Mr. Lunsford has served on the board of directors of the University of North Carolina Board of Visitors and IslandWood. Mr. Lunsford received an M.B.A. and a B.A. in Economics from The University of North Carolina. We believe Mr. Lunsford's broad management, retail and e-commerce experience make him well-qualified to serve on our Board of Directors.

**Defendant Levy**

58.     Defendant Sarah Kirshbaum Levy ("Levy") has served as a Company

director since September 2019.

59.     For the fiscal year ended December 31, 2019, Defendant Levy received $78,737 in compensation from the Company. This included $12,500 in fees earned or paid in cash, $36,043 in option awards, and $30,194 in restricted stock units.

60.     The Company's 2020 Proxy Statement stated the following about Defendant Levy:

> Sarah Kirshbaum Levy has served on the board of directors of Funko, Inc. since September 2019. Ms. Levy served as the Chief Operating Officer of Viacom Media Networks, a division of the entertainment and media company, ViacomCBS, from 2016 through 2019, where she was responsible for overseeing global strategy, finance and operations for the division. Prior to her appointment at Viacom Media Networks, Ms. Levy was Chief Operating Officer at Nickelodeon from 2005 to 2016. She also currently sits on the board of the Lucius Littauer Foundation, which makes grants in the areas of education, social welfare, health care, and Jewish studies. Ms. Levy received an M.B.A. and B.A. in Economics from Harvard University. We believe Ms. Levy's extensive experience in entertainment and media, in particular her familiarity with consumer products licensing, make her well-qualified to serve on our Board of Directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

61.     By reason of their positions as officers, directors, and/or fiduciaries of Funko and because of their ability to control the business and corporate affairs of Funko, the Individual Defendants owed Funko and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Funko in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Funko and its shareholders so as to benefit all shareholders equally.

62.     Each director and officer of the Company owes to Funko and its shareholders the fiduciary duty to exercise good faith and diligence in the administration

of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

63.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Funko, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

64.    To discharge their duties, the officers and directors of Funko were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

65.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Funko, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Funko's Board at all relevant times.

66.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

67.    To discharge their duties, the officers and directors of Funko were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Funko were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Funko's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Funko conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Funko and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Funko's operations would comply with all applicable laws and Funko's financial statements and regulatory filings

filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

68.     Each of the Individual Defendants further owed to Funko and the shareholders the duty of loyalty requiring that each favor Funko's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

69.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Funko and were at all times acting within the course and scope of such agency.

70.     Because of their advisory, executive, managerial, and directorial positions with Funko, each of the Individual Defendants had access to adverse, non-public information about the Company.

71.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Funko.

Verified Shareholder Derivative Complaint

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

72.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

73.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

74.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Funko was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

75.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

76.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Funko and was at all times acting within the course and scope of such agency.

## FUNKO'S CODE OF CONDUCT

77.   The Company's Code of Conduct provides that it "applies to all of our directors, officers and other employees."

78.   In a section titled, "Competition and Fair Dealing," the Code of Conduct states the following:

> All employees should endeavor to deal fairly with fellow employees and with the Company's collaborators, licensors, customers, suppliers and competitors. Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. Employees should maintain and protect any intellectual property licensed from licensors with the same care as they employ with regard to Company-developed intellectual property. Employees should also handle the nonpublic information of our collaborators, licensors, suppliers and customers responsibly and in accordance with our agreements with them, including information regarding their technology, products and product pipelines.

79.   In a section titled, "Company Records," the Code of Conduct states the following:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology, products and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

> All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or the

Company's General Counsel to obtain a copy of any such policy or with any questions concerning any such policy.

80. In a section titled, "Protection and Use of Company Assets," the Code of Conduct states the following:

> Employees should protect the Company's assets and ensure their efficient use for legitimate business purposes only and not for any personal benefit or the personal benefit of anyone else. Theft, carelessness and waste have a direct impact on the Company's financial performance. The use of Company funds or assets, whether or not for personal gain, for any unlawful or improper purpose is prohibited.

> Employees should be aware that Company property includes all data and communications transmitted or received to or by, or contained in, the Company's electronic or telephonic systems. Company property also includes all written communications. Employees and other users of this property should have no expectation of privacy with respect to these communications and data. To the extent permitted by law, the Company has the ability, and reserves the right, to monitor all electronic and telephonic communication. These communications may also be subject to disclosure to law enforcement or government officials.

81. In a section titled, "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct states the following:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

> The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

82.     In a section titled, "Compliance with Laws and Regulations," the Code of Conduct states the following, in relevant part:

> Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's General Counsel.

* * *

> Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact the Company's General Counsel for a copy of the Insider Trading Compliance Policy or with any questions you may have about insider trading laws.

* * *

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Regarding Communications with Analysts, Securityholders and Others to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

83.    The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and failing to report the same. Moreover, four of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

84.    Based out of Everett, Washington, Funko designs, sources, and markets a variety of pop culture consumer products. The Company's offerings include action figures, plush toys and other products, accessories, clothing, handbags, and homewares, which are modeled on and inspired by characters and images from iconic brands such as Star Wars, Marvel Comics, DC Comics, Pokémon, Fortnite, and more. In connection with its product lines, the Company maintains licensing agreements with content providers such as Disney, Marvel, LucasFilm, Blizzard Entertainment, and Warner Brothers.

85.     The Company's most well-recognized Brand is its Pop! Brand, a line of stylized vinyl figurines depicting thousands of different characters from popular movies, TV shows, anime and manga series, video games, and other media.

86.     Throughout the Relevant Period, the Individual Defendants touted Funko's sales figures and growth in the SEC filings and press releases issued by the Company. As would be revealed in February 2020, however, these representations concealed the truth that the Company was facing lower than expected sales, and as such the Individual Defendants' claims regarding the Company's financial guidance and prospects were misleading.

87.     Additionally, in the Company's quarterly reports on Form 10-Q filed with the SEC in August 2019 and October 2019, the Individual Defendants included generic warnings noting that *if* the Company were to misgauge demand for its products, the Company *could* accumulate excess inventory, which *could* have an adverse impact on the Company's business and financial condition. These statements too, were inaccurate, in light of the fact that such risks were not mere hypotheticals, but in fact had already materialized.

### **False and Misleading Statements**

#### ***August 8, 2019 Press Release***

88.     On August 8, 2019, the Company issued a press release announcing its financial results for the fiscal quarter ended June 30, 2019 (the "2Q19 Press Release"). The 2Q19 Press Release stated the following, in relevant part:

Second Quarter 2019 Highlights

- Net sales increased 38% to $191.2 million
- Gross profit[] increased 35% to $71.2 million
- Gross margin[] decreased 90 basis points to 37.2%
- Income from operations increased 98% to $17.1 million
- Net income increased to $11.4 million from $0.3 million
- Earnings per diluted share increased to $0.16

- Adjusted Net Income[] was $12.9 million compared to $3.2 million in the second quarter of 2018, and Adjusted Earnings per Diluted Share[] was $0.25, compared to $0.06 in the second quarter of 2018
- Adjusted EBITDA[] increased 61% to $31.4 million

* * *

The Company is raising its outlook for the full year 2019. The Company now expects net sales to be in a range of $840 million to $850 million. Adjusted EBITDA[] is expected to be in a range of $140 million to $145 million. Adjusted Earnings per Diluted Share[] is expected to be in a range of $1.15 per share to $1.22 per share and is based on estimated adjusted average diluted shares outstanding of 53.5 million for the full year 2019.

Adjusted EBITDA and Adjusted EPS are non-GAAP measures. A table at the end of this release reconciles Funko's outlook for the full year 2019 Adjusted EBITDA and Adjusted Earnings per Diluted Share guidance to the most directly comparable U.S. GAAP financial measures.  Please refer to the "Non-GAAP Financial Measures" section of this press release.

89.    The 2Q19 Press Release also quoted Defendant Mariotti as follows:

Our strong results in the first half of 2019 have allowed us to increase our guidance for the full year. More importantly, the growing range of opportunities for revenue growth, international expansion and entry into new categories make us confident that our best days lie ahead, and that our fans, partners, employees and shareholders can look forward to the future.

**August 8, 2019 Form 10-Q**

90.    Also on August 8, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendant Nickel, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Mariotti and Nickel attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

91.    The 2Q19 10-Q affirmed the financial results contained in the 2Q19 Press Release, and stated the following with respect to the Company's inventory levels:

***Our success depends, in part, on our ability to successfully manage our inventories.***

We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result, it may be difficult to respond to changes in consumer preferences and market conditions, which, for pop culture products, can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. Alternatively, if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

We may also be negatively affected by changes in retailers' inventory policies and practices. As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a "just-in-time" basis. This requires us to more closely anticipate demand and could require us to carry additional inventory. Policies and practices of individual retailers may adversely affect us as well, including those relating to access to and time on shelf space, price demands, payment terms and favoring the products of our competitors. Our retail customers make no binding long-term commitments to us regarding purchase volumes and make all purchases by delivering purchase orders. Any retailer can therefore freely reduce its overall purchase of our products, including the number and variety of our products that it carries, and reduce the shelf space allotted for our products. If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

(Emphasis in original.)

### October 31, 2019 Press Release

92.     On October 31, 2019, the Company issued a press release announcing its financial results for the fiscal quarter ended September 30, 2019 (the "3Q19 Press Release"). The 3Q19 Press Release stated the following, in relevant part:

Third Quarter 2019 Highlights

- Net sales increased 26% to $223.3 million
- Gross profit[] increased 26% to $85.5 million
- Gross margin[] decreased 10 basis points to 38.3%
- Income from operations increased 36% to $22.6 million
- Net income increased to $15.5 million from $7.6 million
- Earnings per diluted share increased to $0.25
- Adjusted Net Income[] was $19.9 million compared to $13.6 million in the third quarter of 2018, and Adjusted Earnings per Diluted Share[] was $0.38, compared to $0.27 in the third quarter of 2018
- Adjusted EBITDA[] increased 20% to $40.6 million

* * *

The Company is reiterating its outlook for the full year 2019. The Company expects net sales to be in a range of $840 million to $850 million. Adjusted EBITDA[] is expected to be in a range of $140 million to $145 million. Adjusted Earnings per Diluted Share[] is expected to be in a range of $1.15 per share to $1.22 per share and is based on estimated adjusted average diluted shares outstanding of 53.5 million for the full year 2019.

Adjusted EBITDA and Adjusted EPS are non-GAAP measures. A table at the end of this release reconciles Funko's outlook for the full year 2019 Adjusted EBITDA and Adjusted Earnings per Diluted Share guidance to the most directly comparable U.S. GAAP financial measures.  Please refer to the "Non-GAAP Financial Measures" section of this press release.

### October 31, 2019 Form 10-Q

93.     Also on October 31, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendant Fall Jung, and contained SOX certifications

signed by Defendants Mariotti and Fall Jung attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

94.    The 3Q19 10-Q affirmed the financial results contained in the 3Q19 Press Release, and stated the following with respect to the Company's inventory levels:

***Our success depends, in part, on our ability to successfully manage our inventories.***

We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result, it may be difficult to respond to changes in consumer preferences and market conditions, which, for pop culture products, can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. Alternatively, if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

We may also be negatively affected by changes in retailers' inventory policies and practices. As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a "just-in-time" basis. This requires us to more closely anticipate demand and could require us to carry additional inventory. Policies and practices of individual retailers may adversely affect us as well, including those relating to access to and time on shelf space, price demands, payment terms and favoring the products of our competitors. Our retail customers make no binding long-term commitments to us regarding purchase volumes and make all purchases by delivering purchase orders. Any retailer can therefore freely reduce its overall purchase of our products, including the number and variety of our products that it carries, and reduce the shelf space allotted for our

products. If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

(Emphasis in original.)

95.     The statements in ¶¶ 88–94 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) The Company was suffering from declining sales; (2) as a result, the Company likely would, and ultimately did, incur a significant write-down related to slower-moving inventory; and (3) due to the foregoing, Funko's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

96.     After the market closed on February 5, 2020, the Company issued a press release disclosing its preliminary financial results for the fiscal quarter ended December 31, 2019. The press release revealed disappointing results across the board, including declining sales and slow-moving inventory. The press release stated the following, in relevant part:

> *Net sales are expected to be approximately $214 million, a decrease of 8% compared to $233 million in the fourth quarter of 2018. Net sales were below expectations in mature markets, including the U.S., due to the challenging retail environment, which resulted in lower than expected purchases among Funko's top customers throughout the holiday season as well as softness in sales related to certain tentpole movie releases*. These factors more than offset strong growth both in Europe and the Loungefly brand during the quarter.

> For the fourth quarter of fiscal 2019, Funko estimates:

> - Net sales in the U.S. will decrease approximately 9%, while net sales internationally will decrease approximately 8%, reflecting declines in

mature international markets, including Australia and Canada, partially offset by continued double digit growth in Europe.

- On a product category basis, net sales of figures will decrease approximately 10% and net sales of other products will decrease approximately 3% versus the year ago period, respectively. Net sales of Loungefly items, included in other products, are expected to show continued double digit growth in the fourth quarter offset by declines in other branded products.

- ***The Company will incur a one-time $16.8 million charge related to the write-down of inventory as a result of the Company's decision to dispose of slower moving inventory to increase operational capacity***. This charge is incremental to normal course reserves and will have an unfavorable impact to gross profit[], gross margin[], net loss and net loss per diluted share in the fourth quarter.

- Gross profit[] will be in the range of $62.3 million to $62.8 million, while gross margin1 will be 29.2% to 29.4%. Gross margin excluding the one-time inventory write-down[] will be 37.0% to 37.3%.

- The Company will have a net loss in the range of $6.7 million to $6.0 million and net loss per diluted share of $0.12 to $0.11.

- Adjusted EBITDA[] will be in the range of $24.7 million to $25.7 million.

- Adjusted Net Income[] will be in the range of $8.1 million to $8.9 million and Adjusted Earnings per Diluted Share[] will be in the range of $0.16 to $0.18.

(Emphasis added.)

97. The press release indicated that sales trends would likely not improve until the second half of 2020, stating the following:

The Company expects its 2020 net sales growth rate to be in the high-single digits to low-double-digits. Additionally, the Company anticipates that top line trends will improve gradually throughout 2020 and will be largely weighted toward the second half of the year, with net sales in the first half expected to be down low-single-digits to flat compared to the first half of

2019. Funko plans to provide expanded guidance for 2020 in connection with the release of fourth quarter and full year 2019 financial results on March 5, 2020.

98.     The press release also quoted Defendant Mariotti as follows:

"While we are disappointed in our fourth quarter results, we are confident that our strong track record of innovation through new product categories and properties, as well as continued international expansion, will continue to propel the Company in 2020 and beyond. The underlying strength of our Pop! and Loungefly brands, combined with Funko's unique ability to leverage evergreen properties will enable the Company to achieve high-single-digit to low-double-digit sales growth in 2020," stated Brian Mariotti, Chief Executive Officer.

99.     On this news, the price of the Company's stock dropped from $15.49 per share at the close of trading on February 5, 2020, to $9.29 per share at the close of trading on February 6, 2020, representing a loss in value of approximately 40%.

100.     Subsequently, after the market closed on March 5, 2020, the Company issued a press release disclosing its financial results for the fiscal quarter and full year ended December 31, 2019. The press release confirmed the disappointing preliminary financial results revealed by the Company on February 5, 2020, indicating that the Company's declining sales were due to "softness at retail during the holiday season which led to a decrease in orders," among other things, and stating the following:

***Net sales decreased 8% to $213.6 million in the fourth quarter of 2019 compared to $233.2 million in the fourth quarter of 2018***. The year-over-year decline was primarily driven by underperformance in more mature markets, including the U.S., Australia and Canada, and reflects three primary factors: softness at retail during the holiday season which led to a decrease in orders, underperformance in key tentpole properties, and difficult comparisons from the year ago period due to the strength of Fortnite which generated 12% of sales in the fourth quarter of 2018.

In the fourth quarter of 2019, the number of active properties increased 14% to 667 from 583 in the fourth quarter of 2018 and net sales per active property decreased 20%. On a geographical basis, net sales in the United States decreased 9% to $144.9 million and net sales internationally

decreased 8% to $68.6 million due to declines in Australia and Canada, partially offset by strong growth in Europe. On a product category basis, net sales of figures decreased 10% to $170.2 million reflecting the overall softness at retail in the quarter. Net sales of other products decreased 3% to $43.3 million versus the fourth quarter of 2018, which reflects decreased sales in plush and accessories, partially offset by double digit growth in our Loungefly brand.

101.   On this news, the price of the Company's stock dropped from $7.24 per share at the close of trading on March 5, 2020, to $6.92 per share at the close of trading on March 6, 2020, representing a loss in value of approximately 4%.

## DAMAGES TO FUNKO

102.   As a direct and proximate result of the Individual Defendants' conduct, Funko has lost and expended, and will lose and expend, many millions of dollars.

103.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, its CFO, and its former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

104.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

105.   As a direct and proximate result of the Individual Defendants' conduct, Funko has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

106.   Plaintiff brings this action derivatively and for the benefit of Funko to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Funko, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

107.   Funko is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

108.   Plaintiff is, and has continuously been at all relevant times, a shareholder of Funko. Plaintiff will adequately and fairly represent the interests of Funko in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

109.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

110.   A pre-suit demand on the Board of Funko is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Mariotti, Brotman, Dellomo, Denson, Irvine, Kriger, Lunsford, and Levy (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was commenced.

111.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while four of them engaged in insider sales based on material non-public information, netting proceeds of over $104 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

112. In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

113. Additional reasons that demand on Defendant Mariotti is futile follow. Defendant Mariotti has served as the Company's CEO since April 2017. He has also served as the CEO of FAH since October 2015, and as the CEO of FHL since May 2013. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Mariotti with his principal occupation, and he receives handsome compensation, including $4,025,457 during 2019. Defendant Mariotti was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings and press releases referenced herein. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded over $13.3 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Mariotti is a defendant in the Securities Class Actions. For these reasons, too, Defendant Mariotti breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

114. Additional reasons that demand on Defendant Brotman is futile follow. Defendant Brotman is the Chairman of the Company's Board, and has served as a

Company director since April 2017. Defendant Brotman serves as a managing partner at ACON, which he co-founded in 1996. He has also served as a director of FAH since October 2015. Additionally, he serves as the Chair of the Company's Nominating and Corporate Governance Committee, and as a member of the Compensation Committee. Defendant Goldman has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. ACON's insider sale before the fraud was exposed, which yielded over $91.5 million in proceeds, demonstrates Defendant Brotman's motive in facilitating and participating in the fraud. For these reasons, too, Defendant Brotman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

115.   Additional reasons that demand on Defendant Dellomo is futile follow. Defendant Dellomo has served as a Company director since April 2017. Defendant Dellomo has also served on the board of directors at FAH since October 2015, and as a director at ACON since October 2006. Additionally, he serves as a member of the Company's Nominating and Corporate Governance Committee. Defendant Dellomo has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. ACON's insider sale before the fraud was exposed, which yielded over $91.5 million in proceeds, demonstrates Defendant Dellomo's motive in facilitating and participating in the fraud. For these reasons, too, Defendant Dellomo breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116.   Additional reasons that demand on Defendant Denson is futile follow. Defendant Denson has served as a Company director since April 2017. Defendant Denson has also served on the board of directors at FAH since June 2016. Additionally, he serves as the Chair of the Company's Compensation Committee, and as a member of the Audit Committee. Defendant Denson has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Denson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.   Additional reasons that demand on Defendant Irvine is futile follow. Defendant Irvine has served as a Company director and as a director of FAH since August 2017. She also serves as the Chair of the Company's Audit Committee, and as a member of the Compensation Committee. Defendant Irvine has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Irvine breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

118.   Additional reasons that demand on Defendant Kriger is futile follow. Defendant Kriger has served as a Company director since April 2017. Defendant Kriger

has also served on the board of directors at FAH since June 2016, and has served as an executive partner at ACON since August 2017. Additionally, he serves as a member of the Company's Nominating and Corporate Governance Committee. Defendant Kriger has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. ACON's insider sale before the fraud was exposed, which yielded over $91.5 million in proceeds, demonstrates Defendant Kriger's motive in facilitating and participating in the fraud. For these reasons, too, Defendant Kriger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.  Additional reasons that demand on Defendant Lunsford is futile follow. Defendant Lunsford has served as a Company director since October 2018. He also serves as a member of the Company's Audit Committee. Defendant Lunsford has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Lunsford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120.  Additional reasons that demand on Defendant Levy is futile follow. Defendant Levy has served as a Company director since September 2019. Defendant Levy has received and continues to receive compensation for her role as a director as

described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Levy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

121.   Additional reasons that demand on the Board is futile follow.

122.   Defendants Denson, Irvine, and Lunsford (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements and the Company's accounting and financial reporting processes. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

123.   As described above, four of the Directors on the Board engaged in insider trading, in violation of federal law. Defendant Mariotti, along with Defendants Brotman, Dellomo, and Kriger through their positions at ACON, netted collective proceeds of over $104 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

124.   The Directors have numerous interlocking business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.

For example, Defendants Brotman, Dellomo, and Kriger each serve as senior officers or directors of ACON, which controlled approximately 40.1% of total voting power over matters set for determination by Company shareholders as of April 3, 2020, including election of directors. Additionally, Defendants Mariotti, Brotman, Dellomo, Denson, Irvine, and Kriger each serve as directors of FAH, with Defendant Mariotti serving as CEO. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

125.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

126.   Funko has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Funko any part of the damages Funko suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

127.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and

cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

128. The acts complained of herein constitute violations of fiduciary duties owed by Funko's officers and directors, and these acts are incapable of ratification.

129. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Funko. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Funko, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

130. If there is no directors' and officers' liability insurance, then the Directors will not cause Funko to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

131. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

132.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

133.  Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Funko's business and affairs.

134.  Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

135.  The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Funko.

136.  In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

137.  In further breach of their fiduciary duties owed to Funko, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) The Company was suffering from declining sales; (2) as a result, the Company likely would, and ultimately did, incur a significant write-down related to slower-moving inventory; and (3) due to the foregoing, Funko's public statements were materially false and misleading at all relevant times.

138.  The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

139.   In breach of their fiduciary duties, four of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

140.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

141.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

142.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

143.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Funko has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

144.   Plaintiff on behalf of Funko has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

145.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

146.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Funko.

147.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Funko that was tied to the performance or artificially inflated valuation of Funko, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

148.   Plaintiff, as a shareholder and representative of Funko, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits— including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

149.   Plaintiff on behalf of Funko has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Waste of Corporate Assets

150.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

152.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

153.   Plaintiff on behalf of Funko has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants Mariotti, Fall Jung, and Nickel for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

154.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.   Funko, along with Defendants Mariotti, Fall Jung, and Nickel are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Mariotti, Fall Jung, and Nickel's willful and/or reckless violations of their obligations as officers and/or directors of Funko.

156.   Defendants Mariotti, Fall Jung, and Nickel, because of their positions of control and authority as officers and/or directors of Funko, were able to and did, directly

and/or indirectly, exercise control over the business and corporate affairs of Funko, including the wrongful acts complained of herein and in the Securities Class Actions.

157.    Accordingly, Defendants Mariotti, Fall Jung, and Nickel are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

158.    As such, Funko is entitled to receive all appropriate contribution or indemnification from Defendants Mariotti, Fall Jung, and Nickel.

## **PRAYER FOR RELIEF**

159.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Funko, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Funko;

(c)    Determining and awarding to Funko the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Funko and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Funko and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the

policies and guidelines of the Board;

2. a provision to permit the shareholders of Funko to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Funko restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: June 5, 2020                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

DocuSign Envelope ID: 1EFEA9B5-E024-4563-AE40-8A80FDA5956F

## **VERIFICATION**

I, Amber Evans am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

6/4/2020

*Amber Evans*

72428B37EEB74BB...

Amber Evans